DALLAS MAILERS UNION, LOCAL NO. 143 and International Mailers Union, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 23984.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 23, 1970.

Decided Jan. 8, 1971.

Reargued April 23, 1971.

Decided June 25, 1971.

Mr. Joel D. Blackmon, Washington, D. C., for petitioners.

Miss Vivien Asplund, Atty., National Labor Relations Board of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, with whom Messrs. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Glen M. Bendixsen, Atty., National Labor Relations Board, were on the brief, for respondent.

Before McGOWAN, TAMM and LEVENTHAL, Circuit Judges.

TAMM, Circuit Judge:

In this case petitioners ask us to review the decision and order of the National Labor Relations Board, which has cross-applied for enforcement of its order, which, among other things, directed the petitioners to rescind the act of expelling one Leon Colston from membership in their organizations, i. e., the Dallas Mailers Union, No. 143 (hereinafter "the Local") and the International Mailers Union (hereinafter "the International").

The dispute was poured into the legal conveyor belt as a result of an altercation occurring in the mailing room of the Dow Jones Company, Inc. between Leon Colston, the mailing room foreman, and Welmar Cantrell, one of the mailing room employees. Apparently Colston's promotion from a rank-and-file employee to foreman of the mail room was not enthusiastically greeted by many of the other employees, including Cantrell, who had previously been foreman for approximately 18 years. On one or more occasions, Colston criticized Cantrell's working habits in the mail room. Colston directed that Cantrell should step a distance of one foot or so from his self-selected position to pick up certain papers while Cantrell, on the other hand, claimed the job could be done while reaching from a flat-footed position. Out of such molehills are mountains made, and incredible though it may seem to those unlearned in the processes of administrative law, two years of proceedings have to date been devoted to this mini-spectacular.

The International pursuant to the request of the Local [1] agreed to assume jurisdiction of Cantrell's charge that Colston was acting in a manner unbecoming a union man by allegedly requiring Cantrell to perform duties not required of others. This charge referred to the stepping down or walking the one foot or so. Cantrell was told to send five copies of his charges to the International and a copy to Colston and Colston was told to send five copies of his reply to the International. On the advice of Dow, Colston refused to send a reply to the International. Because of his refusal Colston was expelled from the Union,[2] thereby losing the many benefits attached to membership therein.

The Board's General Counsel and Dow maintain that the charges brought against Colston and his expulsion from the Union were incidents of harassment by the Union against Colston designed to restrain and coerce Dow in its choice of a foreman to represent the Company in bargaining and/or in the adjustment of grievances all in violation of section 8(b) (1) (B) of the National Labor Relations Act.[3] They also maintain that

---

1. The Local is recognized by the Company as the representative of the rank-and-file employees who work in the mailing room. Both Cantrell and Colston are members of the Local.

2. The "Union" refers to the International and the Local collectively.

3. The relevant provision of the Act is as follows:

§ 158. Unfair labor practices.

\* \* \* \* \*

(b) It shall be an unfair labor practice for a labor organization or its agents—

Cantrell should have followed the procedures for settling grievances set out in the contract between the Company and the Local. The Union characterizes the altercation as merely a personal feud between two of its members, thus bringing it within the Union's jurisdiction.

It is manifestly clear from reading the contract that such trivial disputes were not intended to require a hearing before a trial examiner, an appeal to the National Labor Relations Board and finally an appeal to us. Section 8 of the contract provides in pertinent part that "[t]he foreman shall select and employ all help and shall *direct, control and assign* all employees in his department." (J.A. 69) (Emphasis added.) In subsection (a) of section 9 of the contract it is stated:

> There shall be a standing committee, called the Joint Standing Committee, composed of two representatives of the [Local] and two representatives of the [Company], to which committee shall be referred all disagreements, between the parties to this contract, concerning differences in the interpretation and enforcement of the terms of this contract, which cannot be settled by conciliation.

(J.A. 70.) It is provided further in subsection (d):

> It is agreed that the procedures herein provided for settling disputes by arbitration shall be used *to the exclusion of any other means available.* It further being understood all arbitration decisions rendered under the

terms of this contract shall be final and binding on both parties.
(J.A. 70) (Emphasis added.)

Cantrell's charges stem from the manner in which Colston *directed him in his employment.* This was thus a disagreement to be handled *exclusively* by the procedures provided for in the contract. Colston should never have been expelled from the Union for failing to answer the charges of Cantrell, as they were filed in violation of the contract. We therefore enforce the order of the National Labor Relations Board insofar as it adopts sections 1(c) and 2(a), (b), (c) and (e) of the Recommended Order of the Trial Examiner.[4] (J.A. 47–48.)

Although we have disposed of this petty dispute, no one has solved the problem of eliminating future cases of its lineage from the never-ending flow of judicial traffic. Welmar Cantrell's failure to take one small step for the Company has received only slightly less attention than Neil Armstrong's one small step for man. By confusing excuse for reason Welmar Cantrell eventually made his case the topic of letters and the concern of a trial examiner and later the National Labor Relations Board. Now it has finally come to rest in the bosoms of three judges, who must pick their way through a quagmire of grammar totaling almost 300 pages of briefs, documents, and transcripts that will presumably aid us in determining whether Colston's manner was too overbearing or Cantrell's skin too thin.

At a time when this court is confronted with an all-time high in caseload and

---

(1) to restrain or coerce
\*   \*   \*   \*   \*
(B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.
29 U.S.C. § 158(b) (1) (B) (1964).

4. These sections of the Recommended Order deal with the Union's refusal to follow the proper procedures for the adjustment of disputes as provided for in the contract and their subsequent expulsion of Colston from Union membership. We

do not consider it necessary in this particular case to decide whether the Union acted in violation of section 8(b) (1) (B) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (B) (1964). It is quite enough to find that the Union expelled Colston in violation of the terms of the contract. With reference to section 2(d) of the Recommended Order of the Trial Examiner we rule that notice may be posted, but that such notice may not include a finding or conclusion that section 8(b) (1) (B) was violated.

backlog, it is most unfortunate that three of its judges must conscientiously spend the necessary time to do justice to a dispute that should have been settled long ago within the Company and Union family. We see no hope for the expeditious determination of appeals unless an effective method of weeding out cases of this sort is established to prevent others like it from receiving so much unearned attention. It seems elementary to the very existence of our judicial machinery that infinitesimally small abstract grievance must give way to actual and existing legal problems if courts are to dispose of their heavy calendars. We mention this only to encourage other members of the legal community to constructively think of ways to alleviate the problem. Any step in the right direction would be a giant service to us and the public at large.

Enforced.

## On Rehearing

TAMM, Circuit Judge:

In this reheard case petitioners [1] ask us to review the decision and order of the National Labor Relations Board (hereinafter "the Board") which has cross-applied for enforcement of its order, which, among other things, directed the petitioners to rescind the act of expelling one Leon Colston from membership in their organizations.

This same case was previously considered by us in Dallas Mailers Union, Local No. 143 v. N.L.R.B., supra at 731. In our earlier decision we enforced the order of the Board only in part. We did not consider it necessary at the time to enforce that part of the Board's order which found that petitioners had committed an unfair labor practice. We ruled that it was quite enough to find that the Union [2] had failed to live up to the terms of a collective bargaining contract it had with the employer, the Dow Jones Company, Inc. (hereinafter "Dow" or "the Company"). (At 732 n. 4.) In its unopposed petition for rehearing the Board has urged the court to also resolve the unfair labor practice issue on the ground that the Board is otherwise without jurisdiction to interpret the terms of a collective bargaining contract between a company and a union. We agree with the Board's reasoning that the court must at this time resolve the unfair labor practice issue. As a result and for reasons to follow, we modify our earlier decision in this case to be consistent with our present decision to enforce the order of the Board in its entirety.

The proceedings before the Board began as a result of Dow's filing unfair labor practice charges against the petitioners, whom Dow claims were in violation of section 8(b)(1)(B) of the National Labor Relations Act.[3]

The dispute, which precipitated the proceeding now under review, was the result of an altercation occurring in the mailing room of Dow between Leon Colston, the mailing room foreman, and Welmar Cantrell, who, though now one of the mailing room employees, had previously been foreman for approximately 18 years. On one or more occasions, Colston criticized Cantrell's working habits in the mail room. Colston directed that Cantrell should step a distance of one foot or so from his self-selected position to pick up certain papers while Cantrell, on the other hand, claimed the job could

---

1. Petitioners are the Dallas Mailers Union, No. 143 (hereinafter "the Local") and the International Mailers Union (hereinafter "the International").

2. The "Union" refers to the International and the Local collectively.

3. The relevant provision of the Act is as follows:

§ 158. Unfair labor practices.

\*   \*   \*   \*

(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce

\*   \*   \*   \*

(B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances.

29 U.S.C. § 158(b) (1) (B) (1964).

be done while reaching from a flat-footed position.

The International pursuant to the request of the Local[4] agreed to assume juridiction of Cantrell's charge that Colston was acting in a manner unbecoming a union man by allegedly requiring Cantrell to perform duties not required of others. This charge referred to the stepping down or walking the one foot or so. Cantrell was told to send five copies of his charges to the International and a copy to Colston and Colston was told to send five copies of his reply to the International. Because of his refusal Colston was expelled from the Union, thereby losing the many benefits attached to membership therein.

The Board's General Counsel and Dow maintain that the charges brought against Colston and his expulsion from the Union were incidents of harassment by the Union against Colston designed to restrain and coerce Dow in its choice of a foreman to represent the Company in bargaining and/or in the adjustment of grievances all in violation of section 8(b)(1)(B) of the National Labor Relations Act. As evidence of this they maintain that though the Union was well aware that Cantrell should have followed certain procedures set out in the contract between the Company and the Local for the settling of grievances, it nevertheless took the matter into its own hands. The Union, on the other hand, characterizes the altercation as merely a personal feud between two of its members, thus properly bringing it within the Union's jurisdiction.

The question this court is concerned with is whether there is substantial evidence in the record as a whole to support the Board's finding that the Union was in violation of section 8(b)(1)(B) of the Act. After a careful study of the record, we are bound to conclude there is sufficient evidence to uphold such a finding. It was certainly established in the

record that the Union on numerous occasions at meetings with Company officials expressed a desire that Colston be replaced. Colston's wife during this time was the recipient of abusive phone calls. Colston's car and truck had also been damaged. There was testimony too that the situation had become so tense that Colston was at one point even afraid to go alone into the locker room.

It was during this tumultuous period that Cantrell and Colston were having their differences. It is perfectly evident from reading the contract between the Company and the Union that the dispute between Colston and Cantrell should have been settled by the grievance procedures set forth within the contract. We made this finding in our earlier opinion and will now repeat the relevant portion of that opinion in showing how we reached the conclusion we did. "Section 8 of the contract provides in pertinent part that '[t]he foreman shall select and employ all help and shall *direct, control and assign* all employees in his department.' (J.A. 69) (Emphasis added.) In subsection (a) of section 9 of the contract it is stated:

There shall be a standing committee, called the Joint Standing Committee, composed of two representatives of the [Local] and two representatives of the [Company], to which committee shall be referred all disagreements, between the parties to this contract, concerning differences in the interpretation and enforcement of the terms of this contract, which cannot be settled by conciliation.

(J.A. 70.) It is provided further in subsection (d):

It is agreed that the procedures herein provided for settling disputes by arbitration shall be used *to the exclusion of any other means available.* It further being understood all arbitration decisions rendered under the terms of

4. The Local is recognized by the Company as the representative of the rank-and-file employees who work in the mailing room. Both Cantrell and Colston are members of the Local.

this contract shall be final and binding on both parties.

(J.A. 70) (Emphasis added.)

Cantrell's charges stem from the manner in which Colston *directed him in his employment.* This was thus a disagreement to be handled *exclusively* by the procedures provided for in the contract." (Slip op. at p. 732.)

Though the arbitration procedures spelled out in the contract were called to the attention of the Union, it obstinately went ahead with its own disciplinary procedure, which ultimately resulted in the termination of Colston's membership in the Union and with it the loss of many valuable benefits. Such expulsion then could very well have a definite coercive influence on the man chosen by the Company as its representative. In considering all the previously discussed surrounding circumstances that seem necessarily to tie in with the Union's insistence of disciplining Colston for the performance of his duties as the mail room foreman, we find substantial evidence in the record to support the Board's holding that the Union was in violation of section 8(b)(1)(B) of the Act.

Though we have decided this particular case, we are still confronted with the troubling problem we discussed in our earlier decision, i. e., the difficulty of this court's disposing of its heavy calendar of "actual and existing legal problems" while at the same time being bogged down with "infinitesimally small abstract grievances." Dallas Mailers Union, Local No. 143 v. NLRB, *supra,* at 733–734. It would seem that the courts and the Board could very well be spared the time consuming energy necessarily exhausted in the determination of the type of dispute just considered by us. The solution to the problem is admittedly not an easy one to capture, nevertheless honest efforts to reach one would be most welcomed.

Enforced.